# EXHIBIT A



NANCY M. LEE (State Bar No. 232708)
BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3500
Los Angeles, CA 90067
Telephone: (310) 500-4600
Facsimile: (310) 500-4602
nlee@bhfs.com

Attorneys for Plaintiffs DOUGLAS JACOBSEN
and MONIQUE JACOBSEN

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

OCT 23 2018

Sherri R. Carter, Executive Officer/Clerk of Court

By: Kristina Vargas, Deputy

FAXED

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES, CENTRAL DISTRICT

DOUGLAS JACOBSEN and
MONIQUE JACOBSEN,

        Plaintiffs,

   vs.

WELLS FARGO BANK, N.A.; WELLS
FARGO & CO.; and DOES 1-20;

        Defendants.

Case No. **18STCV01879**

COMPLAINT FOR:

(1) PROMISSORY ESTOPPEL

(2) CALIFORNIA ROSENTHAL FAIR
DEBT COLLECTION PRACTICE ACT
("ROSENTHAL ACT"), CAL. CIV. CODE
SECTION 1788.17

(3) VIOLATION OF THE FAIR CREDIT
REPORTING ACT , 15 U.S.C. § 1681s-2, *et
seq.*

(4) VIOLATION OF CALIFORNIA
UNFAIR COMPETITION LAW, BUS. &
PROF. CODE § 17200, *et seq.*

(5) FRAUD – INTENTIONAL
MISREPRESENTATION

(6) NEGLIGENT MISREPRESENTATION

(7) WRONGFUL FORECLOSURE

(8) DECLARATORY RELIEF

[DEMAND FOR JURY TRIAL]

COMPLAINT

1           Plaintiffs DOUGLAS JACOBSEN and MONIQUE JACOBSEN (the "Jacobsens" or

2   "Plaintiffs") hereby allege as follows:

3                             **INTRODUCTION**

4         1.      Mortgage lenders in California break the law when they make

5   misrepresentations to consumers in an effort to keep them from shopping elsewhere for a

6   loan.  Likewise, mortgage servicers break federal and state law when they engage in a

7   practice called dual-tracking.  Additionally, it's illegal in this state to initiate foreclosure

8   on borrowers' primary residences without first exploring with borrowers options to avoid

9   foreclosure; it's also illegal to falsely certify material information on documents filed with

10   county recorder's offices when pursuing foreclosure.  Plaintiffs, the Jacobsens, bring this

11   case for damages, restitution, and declaratory  relief because they were victims of such

12   illegal and/or unfair sales, lending, and mortgage servicing practices.  The Jacobsens also

13   seek exemplary and punitive damages because Wells Fargo has been systematically failing

14   its mortgage customers for years by breaking and skirting federal and state consumer

15   protection laws. Punitive damages are in the interests of justice and may incent Wells

16   Fargo to improve its practices so that other Californians avoid the monetary and intangible

17   harms experienced by the Jacobsens.

18         2.      In this matter, the Jacobsens relied to their detriment on verbal

19   representations by Defendants, WELLS FARGO BANK, N.A. and WELLS FARGO & 

20   CO. (collectively, "Wells Fargo") that Wells Fargo's mortgage servicing division would

21   forbear collections, credit reporting, and foreclosure proceedings on the Jacobsens' fully-

22   due $820,000.00 Wells Fargo home equity line credit while Wells Fargo's private

23   mortgage banking division was evaluating the Jacobsens' loan refinance application. It

24   turned out that Wells Fargo's loan officers' representations were false and were designed

25   to prevent the Jacobsens from seeking a refinance of their loan with either another loan

26   officer or another lender.  Moreover, because Wells Fargo loan officers were so keen on

27   keeping the refinance—and the accompanying commissions—they didn't offer the

28   Jacobsens opportunities to evaluate other options to mitigate loss on the loan. But despite

1  the promises and assurances of Wells Fargo's private mortgage division, the Wells Fargo

2  mortgage servicing division kept pursuing collections. This eventually led to a surprise

3  foreclosure filing.  And with the Jacobsens' credit history ruined, the family could no

4  longer get a refinance loan and had to liquidate assets to pay-off the loan in cash.

5      3.      The Jacobsens' injuries arise directly from Wells Fargo's unfair practices and

6  failure to implement reasonable policies and procedures to, among other things, timely

7  offer borrowers loss-mitigation options, to facilitate the sharing of accurate and current

8  information regarding the status of any foreclosure proceeding among appropriate

9  personnel, and to provide accurate information in foreclosure proceedings.  According to a

10  Wells Fargo employee this is a case where "the right hand didn't know what the left hand

11  was doing."  Nevertheless, Wells Fargo's conduct is inexcusable and egregious.

12                              **PARTIES**

13      4.      At all times mentioned herein, plaintiffs, Douglas Jacobsen and Monique

14  Jacobsen were and are now residents of Los Angeles County, California.

15      5.      Defendant, Wells Fargo Bank, N.A. is a national bank chartered by the

16  United States Department of Treasury, Office of the Comptroller of the Currency.

17      6.      Defendant, Wells Fargo & Co. is a bank holding company that owns Wells

18  Fargo Bank, N.A.

19      7.      Wells Fargo has, at all relevant times, conducted business within Los

20  Angeles County, California.

21      8.      The true names or capacities, whether individuals or entities corporate, or

22  otherwise, named as Does 1 through 20, inclusive, and each of them, are unknown to

23  Plaintiffs at the present time.  Plaintiffs allege, upon information and belief that each of the

24  fictitiously designated defendants is responsible in some manner for the events and

25  occurrences alleged in this pleading, or conspired in some manner with the named

26  defendants and/or each other, and that Plaintiffs' damages as alleged in this pleading were

27  proximately caused by their conduct.  Plaintiffs will seek leave of court to amend this

28  pleading to state the true names and capacities of such Doe defendants once they have

3020603.1
                              -3-

1  been ascertained.

2  <center>**FACTUAL ALLEGATIONS**</center>

3      9.      Plaintiffs were the borrowers, and Wells Fargo was the lender and loan

4  servicer, on a home equity line of credit, Wells Fargo Loan #XXXXXXXXX36480001

5  (the "Loan") for Plaintiffs' primary residence, the real property located at 25345 Prado de

6  Los Suenos, Calabasas, California 91302 (the "Property"). The Loan was for $820,000.00

7  over ten years and, prior to the events giving rise to this action, the Jacobsens made

8  approximately 120 months of timely payments.

9      **Plaintiffs' Delayed Refinance**

10     10.     On February 17, 2017, Plaintiff engaged Wells Fargo's authorized

11  representative, Vice-President Janine Peck, a licensed loan origination officer (NMLS ID

12  455451) to assist in refinancing the Loan, which was to be fully due in less than one week.

13  Peck had originated other Wells Fargo loans for Plaintiffs over the prior ten years.

14     11.     On that date in February, in order to induce the Jacobsens into engaging Peck

15  to originate the Loan refinancing, Peck told the Jacobsens that, "this is a piece of cake.

16  Wells to Wells is quick," and assured the Jacobsens that the refinance would be completed

17  in a short amount of time.

18     12.     On or about February 21, 2017, the Jacobsens submitted a refinance loan

19  application, which included typically-required documents like personal tax returns and K-1

20  tax forms back to 2014. On February 22, 2017, the Jacobsens submitted additional

21  materials requested by Wells Fargo, including 2014 and 2015 business returns for about 16

22  different companies in which the Jacobsens invested.

23     13.     The Loan reached its end of draw date on February 23, 2017.

24     14.     After submitting materials on February 22, 2017, the Jacobsens did not

25  receive any update or information from Wells Fargo until, on February 27, 2017, Mr.

26  Jacobsen emailed Peck and urged her to call him. He received no response. So, on

27  February 28, 2017, he emailed Peck again and urged her to call him—he included Peck's

28  assistant (another mortgage origination employee, NMLSR ID 450554) in this email

3020603.1

1 message. This employee emailed Mr. Jacobsen on March 8, 2017 saying that "[w]e are
2 working on your file and need you to address a few items." The email asked for additional
3 documents about the Jacobsens' financials and requested that the Jacobsens agree to
4 electronic disclosures, which would, "expedite the disclosure process." The Jacobsens
5 agreed to the electronic disclosures and received on March 15, 2017 a rate lock on a new
6 loan.

7      15.    On March 17, 2017, Wells Fargo requested additional information from the
8 Jacobsens regarding their refinance loan application, to which the Jacobsens promptly
9 replied.

10      16.    On March 23, 2017, exactly one month after the Loan's balloon payment
11 became due, Mr. Jacobsen told Peck by email "we need to fund today." He also asked
12 Peck if the Jacobsens received "an extension for my refi?"

13      17.    On or about March 23, 2017 Peck spoke to Mr. Jacobsen over the phone. In
14 that call, Peck apologized for Wells Fargo's delay in refinancing the Loan, and instructed
15 the Jacobsens not to "worry" about the Loan being past-due because once the refinance
16 was completed, the refinance would pay-off the Loan and there would be no adverse
17 consequences to the Jacobsens.

18      18.    But the refinance did not occur. During underwriting in March and then into
19 April and May, there were issues with the appraisal, then Wells Fargo required detailed
20 information about the Jacobsens' corporate holdings, also, interest rates changed, and other
21 issues outside the Jacobsen's control delayed the refinance. The Jacobsens provided the
22 requested information completely and timely. In all, the Jacobsens supplied Wells Fargo
23 with over 50 different detailed financial documents for themselves and their corporate
24 holdings, which included profit and loss statements, balance sheets, personal and company
25 bank account statements, trust documents, and tax returns.

26      19.    From February and into May, 2017, Peck assured the Jacobsens that they did
27 not need to worry about the Loan. Moreover, in March 2017, she convinced the Jacobsens
28 to seek a refinance of their entire mortgage obligation, which included their first lien

3020603.1      -5-
COMPLAINT

1 | mortgage loan and the Loan that was then in default.

2 |    20. On about April 27, 2017, Mr. Jacobsen became concerned because he

3 | received a call from Wells Fargo collections and expressed his concern to Peck. Peck

4 | replied that she would check to see what the issue is. Not until late May 2017 did the

5 | Jacobsens receive any information contrary to Peck's assurances.

6 |    21. On May 23, 2017, Plaintiffs received from Wells Fargo Servicing Center in

7 | Billings, Montana, a "Notice of Right to Cure Default (Real Estate)" on behalf of Wells

8 | Fargo Bank, N.A.. The Notice demanded payment of $817,033.51 on or before June 27,

9 | 2017. The Notice did not offer loss mitigation opportunities, such as a deferment pending

10 | refinance or a forbearance agreement.

11 |    22. Mr. Jacobsen immediately contacted Peck, requested advice, and stressed

12 | that he did not want any adverse consequences to his credit history or "credit score": Peck

13 | assured Jacobsen that "everything would be cleared once the refinancing was done." Peck

14 | said she would "reach out to [the mortgage servicing center] to let them know what was

15 | going on."

16 |    23. After May 2017, Wells Fargo's loan servicing department continued

17 | contacting the Jacobsens concerning the status of the Loan. It was clear from the

18 | communications that the persons from the servicing department were aware that Jacobsen

19 | was attempting to refinance the Loan with Wells Fargo. Indeed, the servicing department

20 | told Jacobsen that it would continue to contact Jacobsen until the refinancing was

21 | completed so as to "monitor the progress." The servicing department's communications

22 | were consistent with the assurances provided by Peck that once the refinancing was

23 | completed, all of the delinquencies would be cleared at that time.

24 |    24. Nevertheless, out of an abundance of caution, the Jacobsens attempted to

25 | continue making monthly payments on the Loan.

26 |    25. Wells Fargo rejected Jacobsen's attempt to make a monthly payment on the

27 | Loan.

28 |    26. The Jacobsens complained to Peck and expressed their concern about

3020603.1

COMPLAINT

1   negative credit reporting. Peck assured the Jacobsens that everything would be cleared
2   once the refinancing was completed. She assured the Jacobsens that the refinancing would
3   be completed "soon" or "any time".

4       **July 2017 Complaint and Response**

5       27.    In early July 2017, the Jacobsens made a complaint through counsel with
6   Wells Fargo about the delay in refinancing their Loan. The complaint identified their
7   names, loan, and errors regarding the Loan's servicing.

8       28.    On July 24, 2017, Plaintiffs received from Wells Fargo a letter in response to
9   Plaintiffs' complaints about the delay on its refinance application which states, among
10  other things, "We've experienced a high volume of applications, which has caused delays
11  in processing applications. We regret the delays you've experienced in our review of your
12  application and hope our service will meet your expectations going forward."

13      29.    The July 24, 2017 letter to Plaintiffs stated that "[t]o ensure that no adverse
14  information was sent to the consumer reporting agencies while reviewed your application,
15  we placed a 60-day hold on any negative credit reporting for your account. We want you to
16  know this hold will remain in effect until August 04, 2017…"

17      30.    Plaintiffs did not receive in this letter from Wells Fargo any additional
18  clarification about the status of their Loan, opportunities to modify the Loan and avoid
19  foreclosure, or the risks to Plaintiffs in light of Wells Fargo's delays in refinancing their
20  Loan. The response to the Jacobsens' written request was therefore inadequate.

21      **August Communications with Wells Fargo**

22      31.    On August 24, 2017, Wells Fargo's mortgage servicing division called
23  Plaintiff, Mrs. Jacobsen, to attempt to collect upon the Loan. Following the call, on August
24  24, 2017, Plaintiffs' authorized representatives spoke with "Ben" in Wells Fargo's matured
25  loans division. Ben said that his department would stop collections activities once it
26  received notice of a refinance closing date.

27      32.    On August 24, 2017, Mr. Jacobsen shared by phone with Peck a summary of
28  the conversation with Ben from matured loans.

3020603.1                              -7-

1     33.    On or about August 25, 2017, Peck assured the Jacobsens in a telephone call

2  with Mr. Jacobsen that the refinancing would soon be complete.

3     34.    Unbeknownst to Jacobsen, while Peck was making these assurances to

4  Jacobsen, a different department at Wells Fargo reported to three credit reporting agencies

5  that Jacobsen was already several months delinquent on the Loan.

6     35.    Furthermore, despite the promises in Wells Fargo's July 24, 2017 letter to

7  the Jacobsens—which promised no negative reporting until August 4, 2017—Wells Fargo

8  had reported negative information about the Loan's status, indicating that they were

9  delinquent for months prior to August 2017.

10     36.    When Mr. Jacobsen became aware of the adverse information on his credit

11  report, he demanded that Wells Fargo correct the erroneous reporting. Wells Fargo refused

12  to make the correction. In a phone call with Mr. Jacobsen, Peck blamed the internal

13  bureaucracy of Wells Fargo, asserting that "the right hand didn't know what the left hand

14  was doing" and again promised Jacobsen that "everything will be corrected" as part of the

15  refinancing, which the Jacobsens understood to include a correction of the negative reports

16  that Wells Fargo submitted to the credit reporting agencies.

17     37.    As of September 01, 2017, the only other communications the Jacobsens

18  received in the mail about the Loan were monthly statements. For example, the statement

19  dated August 28, 2017 (and file-stamped by Mr. Jacobsen's assistant as received on

20  September 1, 2017) was an "Account Statement", which showed on page 2 that the "Total

21  payment due on Sep 20" was $817,015.51. While the statement included a payment

22  coupon for the entire amount, no place on the mailing did it refer to loss mitigation,

23  foreclosure, or options to foreclosure.

24     38.    In fact, every piece of mail that the Jacobsens received from Wells Fargo has

25  been date-stamped and filed. The Jacobsens never received or were offered foreclosure

26  assistance, loan modifications, or other loss mitigation options.

27     39.    To the Jacobsens' knowledge, Wells Fargo was continuing to consider their

28  application for refinance of the Loan.

### Foreclosure Proceedings

40.   To the Jacobsens' great and apoplectic surprise, on or about November 27, 2017, Plaintiffs received a notice from a non-judicial foreclosure trustee ("Trustee") that the Trustee had been instructed by Wells Fargo to commence foreclosure proceedings against the property related to the Loan.  As of that date, the Jacobsens had not received any notice that their refinance application was denied.

41.   On or about December 1, 2017, Plaintiffs received a notice from Wells Fargo that their "mortgage is currently in foreclosure," and "whatever your current situation, it may still be possible to avoid foreclosure."

42.   The December 1, 2017 letter further asserted that, "We previously sent you a letter informing you about available mortgage assistance options to avoid foreclosure, along with a Customer Information Package for you to complete and return to us to be evaluated for these options."

43.   In fact, the Jacobsens never received such a letter informing them about available mortgage assistance options to avoid foreclosure; nor did they receive a Customer Information Package, as the Wells Fargo December 1, 2017 letter stated.

44.   On November 29, 2017, the Trustee filed in the Los Angeles County Recorder's Office a Notice of Default and Election to Sell Under a Deed of Trust (filing no. CA-17-783082-BF) ("Foreclosure Notice").

45.   The Foreclosure Notice falsely averred that the amount due was $1,165,507.45 as of 11/27/2017. The Foreclosure Notice attached a declaration from Wells Fargo, which averred, "The mortgage servicer has exercised due diligence to contact the borrower pursuant to California Civil Code §2923.55(f) to 'assess the borrower's financial situation and explore options for the borrower to avoid foreclosure'. Thirty (30) days, or more, have passed since these due diligence efforts were satisfied."

46.   In fact, the Jacobsens were not given options to explore to avoid foreclosure.

47.   In fact, the amount due under the Loan was $817,015.51, not the false amount stated in the Foreclosure Notice.

1     48.    Due to the initiation of foreclosure, the Jacobsens' credit history was

2  significantly damaged, which prevented them from being able to get a refinance from

3  Wells Fargo or any other lender.  In 2018, the Jacobsens paid off the Loan in full.

4        **Plaintiffs Relied on Wells Fargo's Representations to their Detriment**

5     49.    During the period of February 17, 2017 through December 2017, over email,

6  the phone, and/or in person, Wells Fargo told the Jacobsens directly and indirectly through

7  its representative Peck and/or her co-workers and Plaintiffs' representatives, expressly and

8  impliedly, that:  (a) the Jacobsens' refinance process was about to be completed; (b) Peck

9  apologized for her lack of updates and the delay on the part of Wells Fargo in concluding

10  the refinancing; (c) any amounts otherwise due under the Loan would be paid out of the

11  refinancing proceeds, (d) Wells Fargo would put a hold on reporting negative information

12  about the Loan to credit reporting agencies and any negative information would be

13  corrected, (e) collection activities on the loan would cease if Peck put a "note" about the

14  pending Loan refinance in the Wells Fargo system of record, and (f) Wells Fargo would

15  not foreclose upon the home equity loan so long as the refinance was in progress.

16     50.    The Jacobsens relied on Peck's representations because:  (a) Peck was a vice-

17  president at Wells Fargo; (b) Peck represented to the Jacobsens that she had particular

18  expertise and experience in home equity loan refinances at Wells Fargo; (c) the Jacobsens

19  had relied successfully on Peck previously when obtaining other Wells Fargo loans; (d)

20  Plaintiffs received confirming information from other offices within Wells Fargo; and (e)

21  at no time during this process did any other office or person at Wells Fargo attempt to

22  inform the Jacobsens of their rights under federal or state law or opportunities with Wells

23  Fargo with regard to preventing the foreclosure of their home equity loan or that a loan

24  forbearance could not be honored if not achieved by working with Wells Fargo's Home

25  Equity division.

26     51.    Wells Fargo's representations were inaccurate, specifically:

27         a.    the refinance loan never closed and was never going to close "soon";

28         b.    Wells Fargo did not ever improve its service to the Jacobsens;

1          c.       Peck was not authorized to effectuate a forbearance on the Loan;

2          d.       Wells Fargo was reporting derogatory information about the

3                        Jacobsens' Loan to credit reporting agencies before August 2017;

4          e.       Wells Fargo did not ever cease collections calls to the Jacobsens; and

5          f.       Wells Fargo instructed the Trustee to commence foreclosure

6                        proceedings against the property related to the Loan.

7      52.      Peck's representations to the Jacobsens prevented the Jacobsens from (a)

8 applying for a refinance loan from another mortgage loan originator; (b) discussing loan

9 modification or forbearance options with the proper persons at Wells Fargo; (c) paying the

10 balloon loan in cash at an earlier date; or (d) taking other actions to protect their interests,

11 property, and credit history.

12      53.      The consequences of Wells Fargo's actions are severe.  When Wells Fargo

13 reported a multi-month delinquency to three credit bureaus, the credit bureaus significantly

14 downgraded the Jacobsens' creditworthiness.

15      54.      As is typical of a consumer whose credit is erroneously downgraded, the

16 Jacobsens have had and will have trouble securing loans or credit lines with Wells Fargo

17 and other institutions, and to the extent that they are successful in finding lenders, the

18 terms of the loans will be less favorable to the Jacobsens in the form of higher interest

19 rates.

20      55.      In addition, Mr. Jacobsen is the Chief Executive Officer of a company that

21 that requires state licenses to operate. As part of the process, Mr. Jacobsen's personal

22 finances are subject to scrutiny.  Consequently, derogatory information on his credit report

23 can be a cause for license denial or increased attorney and professional time to prevent a

24 denial.

25      56.      Wells Fargo, through its vice-president, Peck, was aware of these special

26 circumstances and the adverse consequences that Wells Fargo's actions could have on Mr.

27 Jacobsen and his companies.

28      57.      Moreover, the Jacobsens experienced stress, loss of sleep, disruption, the

1 | expenditure of time and money, and other non-tangible losses and injuries as a result of

2 | Wells Fargo's actions described above.

3 |      58.    Finally, the activities complained of in this Complaint are of the same ilk as

4 | activities that led to a 2012 settlement between Wells Fargo and the U.S. Department of

5 | Justice along with the Department of Housing and Urban Development (HUD) and 49

6 | state attorneys general for deceptive and unfair practices related to mortgage loan servicing

7 | and foreclosure abuses. Well Fargo's failure to reasonably implement the protections

8 | required by the government agencies—which protections were subsequently encapsulated

9 | in the federal Real Estate Settlement Procedures Act—is inexcusable. Neither the large

10 | amount of a consumer's loan, nor the complexity of the consumer's finances, justifies

11 | placing that consumer's home at unnecessary risk of foreclosure and depriving them of

12 | their federal and state rights to explore options to avoid foreclosure.  Accordingly, the

13 | Jacobsen's state the following claims for relief and causes of action from this Court.

14 | <div align="center">**FIRST CAUSE OF ACTION**</div>

15 | <div align="center">**(Promissory Estoppel – All Defendants)**</div>

16 |      59.    The Jacobsens refer to and incorporate by reference all allegations set forth

17 | in the preceding paragraphs above.

18 |      60.    Wells Fargo made the following promises to the Jacobsens (individually and

19 | collectively), by text messaging, telephone, in email and/or in person:

20 |         a.    That the Jacobsens could hold payments on the Loan because the

21 |              refinance would cover the payments on the Loan and the refinance

22 |              application would promptly close;

23 |         b.    That notwithstanding the service department contacting him, the

24 |              foreclosure proceedings would not occur while their refinance

25 |              application was pending;

26 |         c.    That Wells Fargo would not suffer negative credit reporting until

27 |              August 4, 2017 indicating that he was delinquent prior to that time;

28 |         d.    That any negative credit reporting due to failure to make payments on

1            the Loan would be corrected due to the pending refinance application

2            relating to the Loan.

3      61.     Wells Fargo breached the foregoing promises by:

4          a.      Failing to promptly close on the Jacobsens' refinance application;

5          b.      Making negative credit reports to credit reporting agencies that the

6               Jacobsens were delinquent on their payments prior to August 4, 2018;

7          c.      Refusing to make any corrections to negative information on

8               Jacobsens' credit reports, including for the period that the Jacobsen's

9               refinance application was pending; and

10         d.      Initiating foreclosure proceedings against the Jacobsens while their

11               refinance application was pending, and prior to communicating any

12               denial of their pending refinance application, including by filing a

13               Notice of Default that set forth a completely false and overstated

14               owing amount.

15      62.     The Jacobsens actually relied on Wells Fargo's above promises and based

16 upon such reliance did not pay off the Loan in full during the pendency of their refinance

17 application with Wells Fargo, did not seek to obtain financing from any other lender

18 during that time and did not seek out other alternatives to obtaining a refinance from Wells

19 Fargo on the Loan.

20      63.     The Jacobsens' reliance on Wells Fargo's promises were reasonable and

21 foreseeable, including because of their prior relationship with Peck in connection with

22 other Wells Fargo loans, Peck's title, and Peck's representations regarding her authority

23 and expertise regarding the types of loans at issue.

24      64.     The Jacobsen's reliance was detrimental including because the Jacobsens

25 suffered a significant downgrading of their creditworthiness, depletion of liquidity, lost

26 opportunities to obtain financing elsewhere and other damages.

27      65.     Injustice can only be avoided by enforcement of Wells Fargo's promises,

28 including its promise to correct negative reporting on the Jacobsens' credit history and

-13-

COMPLAINT

1   provide prompt refinancing for the amount of the Loan.

2       66.    Additionally, the foregoing has caused the Jacobsens damages in an amount

3   to be proven at trial, but in any event exceeding the jurisdictional minimum of this Court.

4   <div align="center">**SECOND CAUSE OF ACTION**</div>

5   <div align="center">**(Violation of the California Rosenthal Fair Debt Collection Practice Act**</div>

6   <div align="center">**("Rosenthal Act"), Cal. Civ. Code Section 1788.17 – All Defendants)**</div>

7       67.    The Jacobsens refer to and incorporate by reference all the allegations set

8   forth in preceding paragraphs above.

9       68.    Wells Fargo is a debt collector within the meaning of the Rosenthal Act,

10   which includes, any person who, in the ordinary course of business, regularly, on behalf of

11   itself or others, engages in debt collection.

12       69.    Pursuant to Cal. Civ. Code §1788.17, "every debt collector collecting or

13   attempting to collect a consumer debt shall comply with the provisions of Section 1692b to

14   1692j" and 15 U.S.C. § 1692f provides that "[a] debt collector may not use unfair or

15   unconscionable means to collect or attempt to collect any debt."

16       70.    Wells Fargo willfully and knowingly violated the Rosenthal Act by the

17   unfair and/or unconscionable acts described herein, which include providing a completely

18   false outstanding debt amount of $1,165,507.45 for the Notice of Default sent to the

19   Jacobsens (and publicly filed with the Los Angeles County Recorder's Office in November

20   2017).

21       71.    As a result of the violation of the Rosenthal Act, the Jacobsens are entitled to

22   actual damages pursuant to Cal. Civ. Code § 1788.30(a), statutory damages for a knowing

23   or willful violation in the amount up to $1,000.00 pursuant to Cal. Civ. Code § 1788.30(b);

24   and reasonable attorneys' fees and costs pursuant to Cal. Civ. Code § 1788.30(c).

25   <div align="center">**THIRD CAUSE OF ACTION**</div>

26   <div align="center">**(Violations of the Fair Credit Reporting Act ("FCRA"),**</div>

27   <div align="center">**15 U.S.C. § 1681s-2, *et seq.* – All Defendants)**</div>

28       72.    The Jacobsens refer to and incorporate by reference all allegations set forth

1   in preceding paragraphs above.

2        73.   A "consumer reporting agency" is defined by the FCRA as follows:

3            [A]ny person which, for monetary fees, dues, or on a cooperative nonprofit

4            basis, regularly engages in whole or in part in the practice of assembling or

5            evaluating consumer credit information or other information on consumers for

6            the purpose of furnishing consumer reports to third parties, and which uses any

7            means or facility of interstate commerce for the purpose of preparing or

8            furnishing consumer reports. 15 U.S.C. § 1681a(f).

9        74.   Equifax, TransUnion and Experian are "consumer reporting agencies"

10   ("CRAs") as defined by the FCRA.

11        75.   Wells Fargo is a financial institution that furnishes information about

12   consumers to one or more consumer reporting agencies.  Wells Fargo is prohibited from

13   reporting to any consumer reporting agency information that it knows to have factual

14   errors.  Wells Fargo is further prohibited from reporting information that it should have

15   known had factual errors to any consumer reporting agency.

16        76.   Wells Fargo reported to the CRAs that the Jacobsens were seriously

17   delinquent on their payments of the Loan, despite Wells Fargo's knowledge that it had

18   represented to the Jacobsens that it would not make any negative reports that the Jacobsens

19   were delinquent while the refinance application was pending.

20        77.   Jacobsen complained to Wells Fargo about its credit reporting. Wells Fargo

21   had a further duty to, upon learning that it had reported erroneous information to a

22   consumer reporting agency, promptly notify the consumer reporting agency that the

23   previously-supplied information was inaccurate and to provide accurate information to the

24   consumer reporting agency.  Instead, upon learning that it had reported erroneous

25   information to three consumer reporting agencies, Wells Fargo took no action to inform

26   any of the consumer reporting agencies of the error, and Peck even advised Mr. Jacobsen

27   that the error would be corrected.

28        78.   The Jacobsens submitted to the CRAs written disputes in compliance with

3020603.1

1  the FCRA on June 22, 2018. On information and belief, the CRAs notified Wells Fargo

2  about the Plaintiffs' dispute regarding the accuracy of credit reporting by Wells Fargo.

3  Wells Fargo failed to adequately investigate or reinvestigate the dispute, and negative

4  information reflecting delinquency status during the pendency of Plaintiffs' refinance

5  application still remains on the credit report.

6       79.    As a result of Wells Fargo's actions, it is liable for the Jacobsens' actual

7  damages in an amount to be proven at trial, but in any event exceeding the jurisdictional

8  minimum of this Court and reasonable attorneys' fees.

9       80.    In doing the acts alleged herein, Wells Fargo acted willfully, wantonly and in

10  conscious disregard of the Jacobsens' rights, and as such, the Jacobsens are entitled to

11  exemplary and punitive damages against Wells Fargo in an amount according to proof at

12  trial.

13                          **FOURTH CAUSE OF ACTION**

14        **(Violation of UCL, Bus. & Prof. Code § 17200, *et seq.* – All Defendants)**

15       81.    The Jacobsens refer to and incorporate by reference all allegations set forth

16  in preceding paragraphs above.

17       82.    The Jacobsens bring this action as private consumers, on their own behalf,

18  pursuant to California Business and Professions Code § 17200, *et seq.* The UCL prohibits

19  any unfair, unlawful, or fraudulent business practice. Because Business and Professions

20  Code Section 17200 is written in the disjunctive, it establishes three varieties of unfair

21  competition – acts or practices which are unfair, unlawful, or fraudulent.

22       83.    Wells Fargo is in the business of making loans to consumers and profit from

23  the interest payments that the consumers make on the loans.

24       84.    Wells Fargo engaged in unlawful business practices by violating, including

25  but not limited to, the FCRA and Rosenthal Act, as set forth herein.

26       85.    An unfair practice occurs under the meaning of the UCL when it offends an

27  established public policy or when the practice is immoral, unethical, oppressive,

28  unscrupulous or substantially injurious to consumers.

1     86.    Wells Fargo engaged in an unfair business practice relating to the Jacobsen's

2  Loan, similar to the practice known as dual-tracking. Wells Fargo took steps to tie the

3  Jacobsens into the refinancing process for a lengthy period of time, while simultaneously

4  commencing foreclosure proceedings despite reassurances to the borrower that the

5  refinancing application process would be completed soon, any negative credit reporting

6  would be corrected and/or put on hold, and therefore payments on the Loan were not

7  necessary. Federal and state laws have recognized that borrowers need protection against

8  these types of practices, which involve costly surprises to borrowers and constant

9  runarounds by their servicers.

10     87.    Wells Fargo, through Peck, engaged in an unfair business practice of

11  misrepresenting her authority to protect the Jacobsens from the negative consequences of

12  the lengthy refinance process, including that she could prevent foreclosure and fix negative

13  credit reporting.

14     88.    Wells Fargo also engaged in fraudulent business practices when its vice

15  president, Peck, made specific misrepresentations of fact to the Jacobsens, including the

16  representations that, because of their pending application for a refinance, should could

17  prevent foreclosure and any negative reporting would be corrected as a result of the

18  refinance.

19     89.    Wells Fargo and its vice-president Peck knew, or by the exercise of

20  reasonable care should have known, that these representations were untrue or misleading at

21  the time they were made and likely to deceive the Jacobsens.

22     90.    The Jacobsens relied on the representations made by Wells Fargo and its vice

23  president to their detriment, including by not refinancing with another bank, not

24  investigating other loss mitigation options, not insisting on enforcement of their right to be

25  offered a loss mitigation application outside the refinance, not paying-off the loan in cash

26  at an earlier date to protect their credit history, and foregoing other alternative options, and

27  as a result, suffered injury in fact as alleged herein.

28     91.    Accordingly, all interest revenue obtained by Wells Fargo from the

3020603.1

-17-

COMPLAINT

1  Jacobsens' approximately 120 payments on the Loan should be disgorged and restituted to

2  the Jacobsens pursuant to the remedies available under Business & Professions Code §

3  17200 *et seq.*

### FIFTH CAUSE OF ACTION

### (Fraud - Intentional Misrepresentation – All Defendants)

6      92.    The Jacobsens refer to and incorporate by reference all allegations set forth

7  in the preceding paragraphs above.

8      93.    Wells Fargo made the following misrepresentations to the Jacobsens

9  (individually and collectively), directly and indirectly, explicitly and implicitly, by text

10  messaging, telephone, correspondence and/or in person:

11          a.    Peck represented that the Loan refinance would close soon.

12          b.    Peck represented to Mr. Jacobsen that notwithstanding the service

13              department contacting him, the Jacobsens could hold payments on the

14              Loan during the pendency of the refinance application because the

15              refinance would cover the payments on the Loan and Peck placed a

16              "hold" on the service department's collection activities.

17          c.    Peck represented to Mr. Jacobsen that Wells Fargo would correct any

18              negative reporting on the Jacobsen's credit report resulting from their

19              failure to pay the Loan during the refinance application process.

20          d.    That Wells Fargo would not report negative information to credit

21              reporting agencies until August 4, 2017.

22          e.    That Wells Fargo had provided the Jacobsens with a "Customer

23              Information Package" to help Wells Fargo evaluate alternatives to

24              foreclosure.

25      94.    Wells Fargo made the following misrepresentations in documents filed with

26  the Los Angeles County Recorder's Office expressly and in writing:

27          a.    the amount due was $1,165,507.45 as of 11/27/2017, and

28          b.    "The mortgage servicer has exercised due diligence to contact the

1                 borrower pursuant to California Civil Code § 2923.55(f) to 'assess the

2                 borrower's financial situation and explore options for the borrower to

3                 avoid foreclosure'. Thirty (30) days, or more, have passed since these

4                 due diligence efforts were satisfied."

5      95.     The foregoing representations were false because: (a) Wells Fargo's

6 procedures were such that Wells Fargo would report any delinquency regarding payment

7 of the Loan to credit bureaus, even if a refinance was pending; (b) Wells Fargo did not

8 attempt to evaluate the Jacobsens for loss mitigation options to avoid foreclosure and did

9 not "explore" the available options with the Jacobsens; (c) Wells Fargo made negative

10 credit reports at times when it had represented it would not, including information that the

11 Jacobsens were delinquent before August 4, 2017; (d) Wells Fargo in fact, proceeded with

12 the foreclosure process, including by causing a recording of a Notice of Default and

13 Election to Sell Under Deed of Trust on November 29, 2017, which misrepresented that

14 the Property was in foreclosure because the Jacobsens were behind in payments in the

15 amount of $1,165,507.45 as of November 27, 2017. The amount recorded as due with the

16 Los Angeles County Recorder's Office was inaccurate and over stated by over $200,000.

17      96.     The false representations made to the Los Angeles County Recorder's Office

18 were reckless, as any Wells Fargo employee with access to the system of record should

19 have been able to see that the Jacobsens had not been offered loss mitigation opportunities,

20 but were rather pursuing a refinance. Moreover, discovery may show that Wells Fargo or a

21 Doe Defendant made the decision to proceed with foreclosure with malice and ill will

22 toward Plaintiffs, who had complained about the service they had received from Wells

23 Fargo and had becoming increasingly irate as the refinance process took excessively long.

24      97.     Wells Fargo knew that the foregoing representations were false at the time

25 they were made, or at the very least, Wells Fargo made the representations recklessly and

26 without regard for the truth. Wells Fargo knew or should have known that Wells Fargo's

27 procedures would result in Wells Fargo reporting negative information about the Loan to

28 credit reporting agencies and moving forward with the foreclosure process.

3020603.1

1    98.    Peck, on behalf of Wells Fargo, intended for the Jacobsens to rely on her
2  representations so she and Wells Fargo might profit from the proceeds of a refinanced
3  loan.

4    99.    The Jacobsens, given their twenty years of dealings with Wells Fargo and the
5  fact that Peck was a vice president of Wells Fargo, reasonably relied upon the foregoing
6  false statements.

7    100.    The Jacobsens were harmed by a downgrade of their creditworthiness,
8  depletion of their liquidity, and intangible damages, including emotional harm.  The
9  Jacobsens' reliance on Wells Fargo's representations (including representations by Peck)
10  was a substantial factor in causing them harm.

11    101.    The foregoing has caused the Jacobsens damages in an amount to be proven
12  at trial, but in any event exceeding the jurisdictional minimum of this Court.

13    102.    In doing the acts alleged herein, Wells Fargo acted willfully, wantonly and in
14  conscious disregard of the Jacobsens' rights, and as such, the Jacobsens are entitled to
15  exemplary and punitive damages against Wells Fargo in an amount according to proof at
16  trial.

17                              **SIXTH CAUSE OF ACTION**
18                      **(Negligent Misrepresentation – All Defendants)**

19    103.    The Jacobsens refer to and incorporate by reference all allegations set forth
20  in preceding paragraphs above.

21    104.    Wells Fargo made the following misrepresentations to the Jacobsens
22  (individually and collectively), directly and indirectly, explicitly and implicitly, by text
23  messaging, telephone, correspondence, and/or in person:

24            a.    Peck represented that the Loan refinance would close soon.
25            b.    Peck represented to Mr. Jacobsen that notwithstanding the service
26                  department contacting him, the Jacobsens could hold payments on the
27                  Loan during the pendency of the refinance application because the
28                  refinance would cover the payments on the Loan and Peck placed a

1                 "hold" on the service department's collection activities.

2        c.      That Wells Fargo would not report negative information to credit

3                reporting agencies until August 4, 2017.

4        d.      That Wells Fargo had provided the Jacobsens with a "Customer

5                Information Package" to help Wells Fargo evaluate alternatives to

6                foreclosure.

7      105.     Wells Fargo made the following slanderous misrepresentations in filings

8 with the Los Angeles County Recorder's Office expressly and in writing:

9        a.      the amount due was $1,165,507.45 as of 11/27/2017, and

10        b.      "The mortgage servicer has exercised due diligence to contact the

11                borrower pursuant to California Civil Code § 2923.55(f) to 'assess the

12                borrower's financial situation and explore options for the borrower to

13                avoid foreclosure'. Thirty (30) days, or more, have passed since these

14                due diligence efforts were satisfied."

15      106.     The foregoing representations were false, including because: (a) Wells

16 Fargo's procedures were such that Wells Fargo would report any delinquency regarding

17 payment of the Loan to credit bureaus, even if a refinance was pending; (b) Wells Fargo

18 did not attempt to evaluate the Jacobsens for loss mitigation options to avoid foreclosure

19 and did not "explore" the available options with the Jacobsens; (c) Wells Fargo reported

20 negative credit report information at times when it had represented it would not, including

21 before August 4, 2017; (d) Wells Fargo in fact, proceeded with the foreclosure process,

22 including by causing a recording of a Notice of Default and Election to Sell Under Deed of

23 Trust on November 29, 2017, which misrepresented that the Property was in foreclosure

24 because the Jacobsens were behind in payments in the amount of $1,165,507.45 as of

25 November 27, 2017. The amount recorded as due with the Los Angeles County Recorder's

26 Office was inaccurate and over stated by over $200,000.

27      107.     The false representations made to the Los Angeles County Recorder's Office

28 were reckless, as any Wells Fargo employee with access to the system of record should

1   have been able to see that the Jacobsens had not been offered loss mitigation opportunities,

2   but were rather pursuing a refinance. Moreover, discovery may show that the decision to

3   proceed with foreclosure was made with malice and ill will toward Plaintiffs, who had

4   complained about the service they had received from Wells Fargo and had become

5   increasingly irate as the refinance process took excessively long.

6        108.  Wells Fargo knew that the foregoing representations were false at the time

7   they were made, or at the very least, Wells Fargo made the representations without

8   reasonable grounds for believing them to be true.  Wells Fargo knew or should have

9   known that Wells Fargo's procedures would result in Wells Fargo reporting negative

10   information about the Loan to credit reporting agencies and moving forward with the

11   foreclosure sale.

12        109.  Peck, on behalf of Wells Fargo, intended to deceive the Jacobsens and for

13   them to rely on her representations so she and Wells Fargo might profit from the proceeds

14   of the Loan refinance.

15        110.  The Jacobsens, given their twenty years of dealings with Wells Fargo and the

16   fact that Peck was a vice president of Wells Fargo, reasonably relied upon the foregoing

17   statements.

18        111.  The Jacobsens were harmed by a downgrade of their creditworthiness,

19   depletion of their liquidity, and intangible damages.  The Jacobsens' reliance on the

20   representations was a substantial factor in causing them harm.

21        112.  The foregoing has caused the Jacobsens damages in an amount to be proven

22   at trial, but in any event exceeding the jurisdictional minimum of this Court.

23        113.  In doing the acts alleged herein, Wells Fargo acted willfully, wantonly and in

24   conscious disregard of the Jacobsens' rights, and as such, the Jacobsens are entitled to

25   exemplary and punitive damages against Wells Fargo in an amount according to proof at

26   trial.

27

28

**SEVENTH CAUSE OF ACTION**

**(Wrongful Foreclosure – All Defendants)**

114. The Jacobsens refer to and incorporate by reference all allegations set forth in preceding paragraphs above.

115. Wells Fargo caused an illegal, fraudulent, or willfully oppressive initiation of foreclosure proceedings pursuant to a power of sale in a deed of trust.

116. At the time that the Wells Fargo initiated foreclosure proceedings against the Jacobsens, a refinance application for the Loan was pending and Wells Fargo had not yet communicated any denial of the refinance application.

117. The Jacobsens suffered prejudice or harm as a result of Wells Fargo initiating the foreclosure proceedings against him, which included causing a recording of a Notice of Default and Election to Sell Under Deed of Trust on their Property.

118. The sale of the Property has not occurred. Plaintiffs tendered payment in full on the Property.

119. No breach of condition or failure of performance existed on the Jacobsens' part which would have authorized the foreclosure proceedings because they were expressly told by Wells Fargo, through Peck, that they could hold payments on the Loan since the refinance would close soon and that the refinance would cover the payments on the Loan.

120. Had Wells Fargo not made the above misrepresentations to the Jacobsens, the Jacobsens would have obtained refinancing elsewhere and/or paid the outstanding amount due on their Loan with cash at an earlier time in order to avoid initiation of foreclosure proceedings, resulting negative impact on their credit, and emotional distress.

121. The foregoing has caused the Jacobsens damages in an amount to be proven at trial, but in any event exceeding the jurisdictional minimum of this court.

122. In doing the acts alleged herein, Wells Fargo acted willfully, wantonly and in conscious disregard of the Jacobsens' rights, and as such, the Jacobsens' are entitled to exemplary and punitive damages against Wells Fargo in an amount according to proof at trial.

1

**EIGHTH CAUSE OF ACTION**

2

**(Declaratory Relief – All Defendants)**

3      123.   The Jacobsens refer to and incorporate by reference all allegations set forth

4   in preceding paragraphs above.

5      124.   There now exists a controversy between the Jacobsens and Wells Fargo over

6   whether the Jacobsens were delinquent on the Loan, such that Wells Fargo would not be

7   justified in reporting to a consumer reporting agency the information that it actually

8   reported to three credit bureaus and should correct such negative reporting.

9      125.   Specifically, the Jacobsens seek a judicial declaration that, because of Wells

10  Fargo's representations that the Jacobsens would not suffer negative consequences from

11  failing to pay off the Loan while the refinance application was pending, Jacobsen was not

12  delinquent in his payments on the Loan during the pendency of the refinance application.

13     126.   Wherefore, Jacobsen is entitled to a judicial declaration that Wells Fargo

14  reported erroneous information to three credit bureaus when it reported that the Jacobsens

15  were delinquent on the Loan.

16     WHEREFORE, Plaintiff prays for judgment as follows:

17     A) For general, special, consequential and incidental damages according to proof;

18     B) For disgorgement of Wells Fargo's interest revenue from the Loan, and

19  restitution to the Jacobsens of the same;

20     C) For punitive damages;

21     D) For an award of pre-judgment and post-judgment interest;

22     E) For an award of attorneys' fees and costs of suit incurred, pursuant to statute;

23     F) For a judicial declaration that:

24          (i)    The Jacobsens are not and were not delinquent in any payments of the

25                 Loan;

26          (ii)   Wells Fargo provided erroneous information with respect to the

27                 Jacobsens to consumer reporting agencies and credit bureaus; and,

28  ///

3020603.1

-24-
COMPLAINT

1    G) For such other relief as the Court deems proper.

2

3    DATED: October 23, 2018            BROWNSTEIN HYATT FARBER SCHRECK

4

5
                                        By: _____
6                                            NANCY M. LEE

7                                       Attorney for Plaintiffs DOUGLAS JACOBSEN and
8                                       MONIQUE JACOBSEN

9    17648209
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3020603.1                                    -25-
                                           COMPLAINT